MARSHALL v. BOARD OF DIRECTORS MACEDONIA SCHOOL DISTRICT.

4-7562                                        186 S. W. 2d 149

Opinion delivered March 19, 1945.

Smith, J. Appellant, Mrs. Ethel Marshall, filed this suit September 28, 1942, in the chancery court to enjoin the violation of an alleged contract between herself and Macedonia School District No. 20, St. Francis county, Arkansas; or in the alternative to recover damages to compensate its breach on the part of the school district. The suit was dismissed as being without equity and from that decree is this appeal.

The affirmance of this decree is asked upon several grounds, first that the chancery court was without jurisdiction of this case, inasmuch as appellant had a complete and adequate remedy at law. It appears, however, that before final submission the cause was, on the court's own motion, transferred to the law court, but that later, on appellant's motion, the cause was re-transferred to equity, and that this was done without objection. More-

over, appellant prayed that the school district be enjoined from paying to another sums of money alleged to be due her. The county treasurer was made a party and served with process, and it was prayed that he be enjoined from paying such warrants. The case will not therefore be dismissed as having been tried by a court having no jurisdiction.

The alleged contract was for the transportation of the school children residing within the Macedonia district, over a described route to the school of that district each morning, and then returning over the same route each afternoon, for a period of six months, beginning on the 7th day of September, 1942. The contract, made an exhibit to the complaint, recites that it was made and entered into by and between the school district as party of the first part, and appellant, as party of the second part, and its preamble recites: "That for and in consideration of the sum of $125 per school month, to be paid by the party of the first part, party of the second part agrees to conform to all statutory requirements and regulations pertaining to the operation of school buses and to render services under the following conditions to party of the first part, to-wit: . . ."

At the time of the alleged execution of the contract, there had been promulgated, and were in force and effect, certain regulations applicable "To all authorities having regulatory powers over school transportation, and to all school bus operators." Among other provisions contained in these regulations were the following: "Every school bus in the nation is required by general order O.D.T. 21 to have after November 30, 1942, a Certificate of War Necessity fixing the maximum number of miles of operation, and authorizing the necessary fuel, parts, tires, and tubes for same. These certificates will be continuously reviewed and revised to meet only the basic minimum transportation needs. Adherence to policies adopted following many conferences with school authorities and set forth below, will be the basis for determining such minimum needs."

Other provisions read as follows: "Bus routes shall be so arranged that the maximum number of pupils can be transported with the minimum number of bus miles. . . . In planning and operating bus routes the existing boundary lines of school administrative units, such as district, town, township and county, shall not be a controlling factor if the observance of such boundaries prevents a maximum reduction in the number of buses and bus miles. . . . Existing contracts shall be renegotiated when necessary to facilitate reorganization of school bus routes. Conservation of transportation equipment is of paramount importance and the requirement of an existing contract is not an adequate reason for failing to participate fully in this conservation program. . . . Mileage and gasoline allowances certified after February 1, 1943, will depend upon demonstrated proof, presented in applications therefor by school authorities, showing the extent of adjustment of school transportation service in accordance with the policies presented above."

Macedonia school district adjoins and lies west of the Forrest City school district and an arrangement had been made with the directors of the Forrest City district whereby high school pupils residing within the Macedonia district might attend the Forrest City high school without payment of tuition, and would be transported to the Forrest City high school by the buses of that district, provided the children were transported by the Macedonia school bus to a point within the Forrest City district, where they might be picked up by the bus operated by the Forrest City district. The contract in question was executed in contemplation of the fact that this service to the high school children of the Macedonia district would be rendered by the buses of that district, but it was ascertained after the school of the Forrest City district opened that the buses of that district were barely adequate to transport the children residing within the Forrest City district, and the directors of the Macedonia district were notified that this service could not be rendered.

A rough map was prepared showing the mileage to be covered under the contract, as let, totaling 28 miles each day. After notice from the Forrest City district that pupils from the Macedonia district would not be received, it became unnecessary to transport the Macedonia pupils to the Forrest City district, and the mileage was materially reduced, not less than four miles by any of the testimony, and considerably more by other testimony.

The contract sued on was prepared by the county supervisor of schools of St. Francis county, in which county both the Macedonia and Forrest City districts are located, by using a blank form prepared for that purpose, and the blank spaces were filled in by that official. He testified as follows: he attended the meeting at which the Forrest City district agreed to receive high school pupils from the Macedonia district and it was explained and understood that if the Forrest City buses became too crowded, the Macedonia pupils would have to quit riding them, and he directed the Macedonia directors to make this explanation to prospective bidders for the contract to transport the Macedonia pupils to the schools in that district. Appellant denies that she was aware of this arrangement, but whether aware of it or not, her contract was subject to the requirements of the O.D.T. regulations set out above, compliance with which was essential in procuring the gasoline, etc., necessary to operate the bus.

Mr. Armstrong, the county supervisor, further testified that after the contract had been let, he called at the store of Mr. Sulcer, the secretary of the Macedonia School Board, who requested him to fill in the blanks, and that Sulcer told him the contract had been let, not to appellant, but to her husband, and that appellant's husband, C. N. Marshall, had asked that appellant's name be written in the blank space for the reason that he was afraid that if the contract was in his name, it might interfere with a pension which he was drawing and this Sulcer did, but he testified the board had not authorized that action, and that no member of the board signed the contract. Appellant, her husband and one Summers, all

testified that the contract was let to her; all the directors testified to the contrary.

Appellant drove the bus for two weeks and received pay for that service, but the testimony is in sharp and irreconcilable conflict as to the circumstances under which, and the reasons for which her services were discontinued.

Appellant testified that the president of the school board came to her home in an intoxicated condition, one Sunday afternoon, and notified her that the contract had been canceled and would be re-let to one Aldridge, a relative of one of the school directors, for a less consideration and on the following day she saw Aldridge on the route, and that she did not continue to perform the contract because Aldridge had taken over its execution. She testified that she purchased a second-hand bus to enable her to perform the contract, which was not adaptable to any other use, and that to pay for this bus and repairs thereto, she borrowed money from a bank in Forrest City, and gave a mortgage to secure its payment, and that in addition, she gave Summers, from whom she purchased the bus, five notes for $40 each, and another note for $37, all in part payment of the bus.

It appears, however, that the mortgage to the bank was not given by appellant, but by her husband, and that none of the notes were signed by her, but all were signed by her husband. We think this testimony warrants the finding that appellant was not the real party in interest, and this testimony is reinforced by that of the directors to the effect that the contract was let to appellant's husband and it provides that it might be assigned without the written consent of the school board, which was never given, except that Sulcer, the secretary of the board, testified that he directed the county supervisor to write into the blank used in preparing the contract, the name of appellant, and not that of her husband, for the reason herein previously stated. It may be repeated that no member of the school board ever signed the contract.

We are of the opinion also that appellant refused to perform the contract after the directors attempted to

modify it to conform to O.D.T. regulations. Neal, the president of the school board, testified that when it became necessary to adjust the bus route, a meeting of the board was called, and held at Sulcer's store, which appellant and her husband attended, and they were advised of the change in the route the board was required to make, and that the route had been reduced. Appellant was offered $100 per month for her services, which she refused to take, and for several days no bus service was provided, and a new contract was let for the same consideration the district had offered to pay appellant.

The county supervisor gave testimony to the same effect. Upon being advised that bus service was not being furnished, and had not been for several days, the supervisor visited the district to adjust the controversy. He testified that the route was adjusted from approximately 28 miles to 14 miles, and that "the O. N. Marshall route failed to operate under the adjustment for some three or four school days" during all of which time no bus service was furnished and that at his direction a new contract was let.

We think the school board was not only authorized, but was required to make this adjustment, otherwise gasoline, tires, etc., would not have been procurable, and that therefore it was appellant and not the school board which breached the contract, if indeed there was one between appellant and the district, but as there was no contract, no question arises as to compensation for damages. *Rock* v. *Deason & Keith,* 146 Ark. 124, 225 S. W. 317; *Lion Oil Co.* v. *Bailey,* 200 Ark. 436, 139 S. W. 2d 683; § 1938, Williston on Contracts. See, also, the extensive "Annotations on Legal Questions arising out of War conditions," 147 A. L. R. 1181.

We conclude, therefore, that the decree dismissing the cause as being without equity is correct, and it is, therefore, affirmed.